BROWNE GEORGE ROSS LLP
Andrew A. August (State Bar No. 112851)
  aaugust@bgrfirm.com
Kevin F. Rooney (State Bar No. 184096)
  krooney@bgrfirm.com
101 California Street, Suite 1225
San Francisco, California 94111
Telephone: (415) 391-7100
Facsimile: (415) 391-7198

Attorneys for Innovative Bowling Products, LLC
and John Jameson

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| INNOVATIVE BOWLING PRODUCTS, LLC, a Pennsylvania limited liability company and JOHN JAMESON, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>EXACTACATOR, INC., a California corporation,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

1191773.1

Case No.

COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

Plaintiffs, Innovative Bowling Products, LLC and John Jameson (collectively "Plaintiffs" or "Innovative") bring this action against Defendant Exactacator, Inc. ("Defendant" or "Exactacator") (collectively the "Parties") and allege as follows:

## I.    Introduction

1.    This case is unusual in that it arises from the highly *successful* leveraged acquisition in 2014 by Plaintiff Innovative, a division of Defendant Exactacator's bowling products business.  Because of the success of the transaction and the realization that the business will no longer remain in the family of Exactacator's principals, Defendant's principals have seller's remorse.  To seize on that remorse, Defendant's principals are refusing to execute two documents (a subordination agreement and intercreditor agreement) necessary to facilitate the third party financing of next payment of the acquisition price contemplated by the transaction.  Even though Innovative and its lender are ready, willing and able to fund the loan, they cannot do so unless and until Defendant signs these documents.  By refusing to act in good faith under the governing transaction document, Defendant has manufactured a pretextual default.

2.    In recent discussions between the Parties' principals, Defendant and its transaction counsel told Innovative and its lawyer that Exactacator will soon declare a default for non-payment and begin legal efforts to force Innovative to forfeit the business, even though it has already paid Exactacator more than $5 million and the business is more successful now than it was in 2014 when Exactacator signed the same two documents.  This action is necessary to prevent that forfeiture.

## II.    Factual Overview

3.    Innovative brings this action seeking to compel Exactacator to specifically perform under an asset purchase agreement between the Parties by accepting from Innovative the second of three tranche payments Innovative is required to make pursuant to the agreement.

4.    Innovative purchased Exactacator in exchange for $6 million to be paid over time in three separate tranche payments plus other consideration.  Innovative made the first tranche payment in the amount of $2 million dollars to Exactacator at the time of closing, on or about January 31, 2014, after Exactacator's principals signed the same two documents they are refusing

COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

to sign now.  Innovative has paid Exactacator all additional consideration required to be paid under the agreement, up to the January 1, 2019 second payment.

5.    As required by the agreement, the Parties entered into a promissory note concerning the remaining $4 million to be paid to Exactacator ("Note"), and a security agreement which gives Exactacator a security interest in Innovative's assets until the $6 million is paid in full.

6.    The Parties discussed, understood and agreed that Innovative would use third party financing and cash flow from the business to meet its payment obligations.  To that end, Innovative obtained financing from Metro Bank (now, First National Bank of Pennsylvania) for the initial $2 million payment.  Importantly, Exactacator agreed to and did subordinate its security interest to Innovative's lender by entering into an intercreditor agreement with Innovative and the lender.  As to the remaining $4 million, Innovative is required to make two additional tranche payments to Exactacator pursuant to the Note:  $2 million by January 1, 2019 and the remaining balance (including interest) by January 1, 2024.  When the transaction was negotiated the Parties contemplated and understood that Innovative would obtain similar financing for the remaining two tranche payments *and* Exactacator would again subordinate its security interest to the lender, as is standard operating practice in leveraged buyouts such as this transaction.

7.    After much work on the part of Innovative's financial team to obtain terms that would be acceptable to Exactacator, on or about November 27, 2018, Innovative received a commitment letter from PeoplesBank.  The commitment confirmed that PeoplesBank would make to Innovative, a $1,800,000 term loan and make available a line of credit in an amount up to $1,200,000.  The purpose of this loan was to fund Innovative's second tranche payment of $2,000,000 to Exactacator by January 1, 2019.  Thereafter, Innovative requested that Exactacator sign an intercreditor agreement with PeoplesBank, just as it had done with Innovative's prior lender.  Exactacator unreasonably refused to enter into the intercreditor agreement and falsely claimed it is not required to subordinate its security interest to PeoplesBank.  Exactacator also expressed concern over the structure of the proposed loan.  In response to these concerns, Innovative secured a revised commitment from PeoplesBank.  The terms of this revised

COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

commitment are memorialized in a commitment letter from PeoplesBank dated January 4, 2019. Exactacator continued to refuse to sign into the intercreditor agreement. Thinking they had Innovative over a barrel, Exactacator's principals presented Innovative with a list of extortionate demands that they would require in order to sign the intercreditor agreement. The demands included additional consideration to Exactacator in excess of $1 million. Exactacator also offered to lend the money to Innovative as an alternative to PeoplesBank but never gave Innovative any terms for the proposed loan.

8. Innovative made a proposal to resolve the impasse on January 8, 2019. In response to this proposal, Exactacator threatened Innovative that it would declare a default on the Note and take over Innovative. By refusing to sign the intercreditor agreement and refusing to subordinate to PeoplesBank, Exactacator has created, through false pretenses, a default, with the goal of attempting to create a forfeiture by Innovative after Innovative has paid to Exactacator over $5 million.

9. Because Exactacator's bad faith refusal to subordinate its security interest is (1) antithetical to the purpose of the agreement, (2) diametrically opposed to each Party's understanding of the agreement, and (3) commercially unreasonable, this action is accordingly necessary to compel Exactacator to specifically perform the agreement by accepting the $2 million payment from Innovative and enter into the intercreditor agreement, subordinating its security interest to PeoplesBank.

10. As stated below, Innovative also seeks injunctive relief as a result of Exactacator's violation of California's unfair business practices law and damages due to its anticipatory breach of the agreement. Innovative also seeks a declaratory judgment from the Court confirming that Exactacator is required to act reasonably, with proper motives, to effectuate the purposes of the agreement by executing the intercreditor agreement, and to not act arbitrarily, capriciously, or inconsistently with the Parties' expectations.

## II. Jurisdiction And Venue

11. This Court has diversity jurisdiction over the present action pursuant to 28 U.S.C. §1332(a)(1). Innovative is a Pennsylvania limited liability company. Exactacator is a California

1191773.1

-3-

Case No.

COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

corporation with its principal place of business in Stockton, California.  The amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

12.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a), as Defendant does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    Parties

13.    Plaintiff Innovative Bowling Products, LLC is, and at all times relevant hereto was, a Pennsylvania limited liability company.

14.    Plaintiff John Jameson is, and at all times relevant hereto was, an individual residing in West Manchester Township, County of York, State of Pennsylvania and is the Sole Member of Plaintiff Innovative Bowling Products, LLC.

15.    Plaintiffs are informed and believe, and thereon allege, that Defendant Exactacator, Inc. is a California corporation, with its principle place of business in Stockton, California.

### IV.    The Governing Asset Purchase Agreement

16.    Innovative is engaged in the business of manufacturing and selling certain products that are used in the bowling industry.  Exactacator was likewise involved in the same business, specializing in certain items sold under the "VISE" product line, before being purchased by Innovative.

17.    On or about December 18, 2013, Innovative entered into a written Asset Purchase Agreement ("APA") which provides in pertinent part that Innovative acquired certain assets of Exactacator, including all inventory, personal property, books and records, all of Exactacator's claims against third parties, the goodwill of the Exactacator and all of Exactacator's contract rights with third parties in exchange for $6 million, payable in three tranches over time.  The first $2 million payment was to be made at closing and the additional $4 million was to be paid in accordance with a promissory note ("Note"), also executed by the Parties.  A true and correct copy of the APA is appended hereto as **Exhibit A** and incorporated herein by this reference.

18.    In accordance with the intention of the Parties and as is commercially customary with similar transactions, all payments made by Innovative were to be financed and Exactacator

1191773.1

COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

was required to subordinate its security interest to Innovative's lender. The APA expressly confirmed Exactacator's agreement to subordinate its security interest in Section 2 as follows:

> Pursuant to the Security Agreement [Exactacator] shall have a **second priority security interest in all assets of Buyer, including, without limitation, the Assets which are the subject of this Agreement**, and a first priority interest in Buyer's rights under the JV Agreement. (Emphasis added.)

19.    Section 4(b) of the APA explains that Innovative's lender will have a first priority security interest as follows:

> [Exactacator] acknowledges that the lender providing Acquisition Financing ("Lender") will at the Closing have a first prior interest in Buyer's assets, including the Assets which are the subject of this Agreement.

20.    Section 4(b) also states:

> The Parties agree that until the Note is paid in full, any indebtedness of Buyer which is secured by Buyer's assets, including, without limitation, the Acquisition Financing, shall not have an outstanding balance in excess of $4,500,000, which amount may include sums borrowed by Buyer to fund the principal payments due under the Note.

21.    During the negotiations of the APA, it was discussed and understood by all Parties that the same subordination would be required in order for Innovative to make the future tranche payments. The language of Section 4(b) explicitly acknowledges that future financing will be required in order to make the subsequent tranche payments.

## COUNT ONE

### (Specific Performance)

22.    Plaintiffs incorporate by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

23.    On or about December 18, 2013, Innovative entered into a written APA. The APA is both reasonable and supported by adequate consideration, and obligates both Parties to act in good faith.

24.    On or about December 19, 2018, despite Innovative having fully performed on all obligations under the APA, Exactacator failed and refused to enter into an intercreditor agreement with Innovative and PeoplesBank, confirming Exactacator's subordinated security interest pursuant to the APA.

1191773.1

-5-                                                    Case No.

COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

25.     In order for Innovative to perform its obligations under the APA, Exactacator is required to act in good faith to execute all necessary documents so that Innovative can make the required payments under the APA.

26.     Notwithstanding Exactacator's obligations, Exactacator instead repudiated its obligations under the APA and threatened to declare Innovative in default.

27.     Innovative confirmed that it is ready, willing, and able, to perform on the APA provided that Exactacator enter into the intercreditor agreement.  Exactacator's refusal to sign the intercreditor agreement makes Innovative's performance impossible.

28.     Exactacator's refusal to enter into the intercreditor agreement contemplated by the Parties and the APA constitutes a bad faith breach of the APA and is designed to deprive Innovative of its contractual rights under the APA.

29.     This breach has caused injury to Innovative, for which it is without an adequate remedy at law.  Specifically, damages will not adequately compensate Innovative for Exactacator's breach.  Accordingly, Innovative seeks an order requiring Exactacator to enter into the intercreditor agreement.

30.     Innovative has performed, and is prepared to perform, all obligations under the APA.

31.     Plaintiffs have been compelled to retain counsel and have incurred and continue to incur legal fees and costs, recoverable under the APA.

## COUNT TWO

### (Anticipatory Breach of Contract)

32.     Plaintiffs incorporate by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

33.     On or about December 18, 2013, Innovative entered into a written APA.

34.     Sections 2 and 4 of the APA require Exactacator to subordinate its security interest in Innovative's assets to Innovative's lender.  The APA necessarily contemplates that Innovative would obtain financing for each tranche payment under the APA and Note and that Exactacator would subordinate its interests for each financed payment.

35. Innovative has complied with all terms of the APA and made, with the exception of the January 1, 2019 payment, which is the subject of this dispute, all payments required by the APA, and Exactacator has accepted all such payments without issue.

36. Exactacator's failure to accept Innovative's second financed tranche payment of $2 million and execute an intercreditor agreement so as to comply with the purpose of the APA, and its continued failure to do so along with its threats of declaring a default of the APA constitutes an anticipatory breach of the agreement.

37. As a result of Exactacator's breach of the APA, Plaintiffs have suffered damages in an amount according to proof at trial.

38. Plaintiffs have been compelled to retain counsel and have incurred and continue to incur legal fees and costs, recoverable under the APA.

## COUNT THREE

### (Breach of the Covenant of Good Faith and Fair Dealing)

39. Plaintiffs incorporate by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

40. Implied in every agreement, including the APA, is a covenant of good faith and fair dealing which imposes on Exactacator, the obligation not to take any act or make any omission that would deprive Innovative of the benefits and protections of the APA.  In this case, the covenant obligates Exactacator to act at all times in good faith toward Innovative.

41. Plaintiffs reasonably expected that Exactacator would act in accordance with the terms of the APA and perform all obligations necessary to effectuate the purpose of the APA, including but not limited to cooperating with Plaintiffs fairly, equitably, and in good faith concerning Plaintiffs obtaining of financing to make all payments required by the APA.

42. Innovative has performed all, or substantially all, of the significant things the APA required it to do.

43. Exactacator's failure to accept Innovative's second financed tranche payment of $2 million and execute an intercreditor agreement so as to comply with the purpose of the APA, and

1191773.1

-7-

Case No.

COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

its continued failure to do so along with its threats of declaring a default of the APA constitutes a breach of the implied covenant of good faith and fair dealing.

44.     As a direct and proximate result of Exactacator's breach of the implied covenant of good faith and fair dealing contained in the APA, Innovative has suffered, and continues to suffer, general and consequential damages.

45.     Plaintiffs have been compelled to retain counsel and have incurred and continue to incur legal fees and costs, recoverable under the APA.

## COUNT FOUR

### (Declaratory Judgment – 28 U.S.C. § 2201))

46.     Plaintiffs incorporate by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

47.     An actual controversy exists between Plaintiffs and Defendant regarding their respective rights and duties in connection with Exactacator's duty under the APA to accept Innovative's $2 million financed payment and enter into PeoplesBank's intercreditor agreement, confirming that Exactacator is subordinating its security interest to secondary position behind PeoplesBank, so as to effectuate the purpose of the APA.

48.     Exactacator contends that it is not required to enter into the intercreditor agreement. Innovative contends that Exactacator is required to enter into the intercreditor agreement because a failure to do so would prevent Innovative's performance of the APA and deprive Innovative of the benefits of the APA.

49.     Plaintiffs have no adequate remedy in the ordinary course of law other than the relief sought herein.

50.     A judicial determination is necessary and proper at this time under the circumstances so that Plaintiffs may obtain necessary financing to perform under the APA.

## COUNT FIVE

### (California Business and Professions Code § 17200, et seq.)

51.     Plaintiffs incorporate by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

52.     Exactacator's activities as stated herein constitute unfair competition within the State of California and in violation of California law as set forth under Business and Professions Code § 17200.

53.     Exactacator's wrongful activities have caused, and unless enjoined by this Court will continue to cause, irreparable injury and other damage to Innovative's business, reputation and good will.  Innovative has no adequate remedy at law and thus seeks injunctive relief requiring Exactacator to comply with the APA by accepting the $2 million financed payment from Innovative and executing the intercreditor agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant, as follows:

1.     For specific performance of the APA, requiring Exactacator to execute the intercreditor agreement and work with Innovative in good faith so as to permit Innovative to obtain financing to make the second tranche payment required by the APA and the Note in the amount of $2 million;

2.     For a declaration confirming that Exactacator is required to subordinate its security interest in Innovative's assets in order to allow Innovative to obtain financing for all payments required by the APA, including the final tranche payment due January 1, 2024;

3.     For preliminary and permanent injunctive relief requiring Exactacator to execute the APA and all other forms reasonably necessary in order for Innovative to obtain financing to make the $2 million payment required by the APA;

4.     For actual and compensatory damages in an amount to be proven at trial, and for interest thereon at the highest lawful rate;

5.     For Plaintiffs' costs of suit incurred herein;

6.     For Plaintiffs' attorneys' fees; and

1191773.1

-9-

Case No.

COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND DAMAGES

7.    For such other and further relief as the Court may deem just and proper.

DATED:  January 25, 2019                    Respectfully submitted,

BROWNE GEORGE ROSS LLP
    Andrew A. August
    Kevin F. Rooney


By:    _____/s/ Andrew A. August_____
            Andrew A. August
Attorneys for Innovative Bowling Products, LLC and
John Jameson

# EXHIBIT A

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made as of December 18, 2013, by and among INNOVATIVE BOWLING PRODUCTS, LLC, a Pennsylvania limited liability company ("Buyer"), EXACTACATOR, INC., a California corporation ("Seller"), and JOHN JAMESON ("Jameson"). This Asset Purchase Agreement, including all schedules and exhibits attached hereto, is referred to as the "Agreement".

## RECITALS

A.    Seller is engaged in the business of manufacturing and selling certain products that are used in the bowling industry, including, without limitation, certain items sold under the "VISE" product line (the "Business");

B.    Buyer desires to purchase and Seller desires to sell certain assets of the Business but excluding the real property on which the Business is now conducted and the Retained Assets (as hereinafter defined);

C.    Jameson is the sole member of Buyer.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1.    **Purchase of Assets.**

1.1    Purchase of Assets. At the Closing (as hereinafter defined), Seller will sell, transfer, and convey to Buyer, and Buyer will purchase from Seller, the following assets of the Business (the "Assets"):

(a)    Inventory. All inventory including raw materials, work-in-progress, parts, supplies, finished products, shipping cartons and materials, and operating supplies, including all such items shipped from vendors on or prior to the Closing Date (as hereinafter defined) but not yet received by Seller.

(b)    Personal Property. All tangible personal property, including shop equipment and tools, trailers, forklifts, truck tools and equipment, office furniture and equipment, and furnishings, including, without limitation, those identified on Schedule A, but excluding the embroidery machine and other items of personal property identified in Schedule B attached hereto.

(c)    Books and Records. All books and records pertaining to the Assets.

(d)    Claims.  All of the claims of Seller against any parties relating to items included in the Assets, including, without limitation, unliquidated rights under manufacturers' and vendors' warranties or guaranties.

(e)    Goodwill.  The goodwill of the Business.

(f)    Contracts.    The contracts with the suppliers identified in Schedule C attached hereto, which contracts shall be assigned by Seller to Buyer at the Closing pursuant to a form of assignment mutually acceptable to both parties.

2.1    Retained Assets.    Notwithstanding Section 1.1 above or any other provision of this Agreement to the contrary, Seller shall not transfer to Buyer at the Closing and the Assets shall not include the assets and items listed in Schedule B attached hereto and incorporated herein by reference (collectively the "Retained Assets").

2.    **Purchase Consideration.**  At the Closing, Buyer shall pay Seller cash in the amount of $2,000,000 ("Cash Consideration") and deliver to Seller a promissory note in the amount of $4,000,000 in the form attached hereto as **Exhibit "A"** ("Note").  The Note shall be secured by a Security Agreement in the form of **Exhibit "B"** attached hereto ("Security Agreement").  Pursuant to the Security Agreement Seller shall have a second priority security interest in all assets of Buyer, including, without limitation, the Assets which are the subject of this Agreement, and a first priority interest in Buyer's rights under the JV Agreement (as hereinafter defined).  Payment of the Note shall be personally guaranteed by Jameson pursuant to a Guaranty in the form of Exhibit "C" attached hereto.

3.    **Real Property.**  Commencing January 1, 2014, Buyer shall lease certain real property from Seller consisting of an approximately 20,000 square feet of space in the building now used by Seller for the operation of the Business located at 2237 Stagecoach Road, Stockton, California ("Premises") pursuant to a lease in the form of Exhibit "D" attached hereto ("Lease"). The Lease shall terminate on January 31, 2014 if the Closing has not occurred by that date.

4.    **Acquisition Financing; Joint Venture Agreement; License; Operation of Business**.

(a)    Buyer's obligation to purchase the Assets is contingent upon Buyer receiving a written commitment from Metro Bank or another lender acceptable to Buyer ("Financing Commitment") to make a loan to Buyer in the amount of the Cash Consideration and to provide Buyer with an operating line of credit in the amount of $500,000 (the "Acquisition Financing").  Buyer shall have until January 20, 2014 to satisfy the Acquisition Financing contingency by providing Seller with a copy of the Financing Commitment.  If the Acquisition Financing contingency is not satisfied by said date, and unless the parties mutually agree otherwise, this Agreement shall terminate and thereafter neither party shall have any further liability to the other under this Agreement except as expressly provided herein.

(b)    Seller acknowledges that the lender providing the Acquisition Financing ("Lender") will at the Closing have a first prior interest in Buyer's assets, including the Assets which are the subject of this Agreement.  The documents evidencing the Acquisition Financing

and/or a separate agreement between Seller, Buyer, and Lender (the "Intercreditor Agreement") shall provide for Seller to receive a copy of any notice sent to Buyer by Lender, including any notice of default, provide Seller with a commercially reasonable period of time to cure any default by Buyer with respect to the Acquisition Financing ("Loan Default"), and provide a mechanism whereby Seller, upon curing such a Loan Default, may acquire title to the Assets by paying the remaining amount owed by Buyer to Lender with respect to the Acquisition Financing. The parties agree that until the Note is paid in full any indebtedness of Buyer which is secured by Buyer's assets, including, without limitation, the Acquisition Financing, shall not have an outstanding balance in excess of $4,500,000, which amount may include sums borrowed by Buyer to fund the principal payments due under the Note.

(c)    Buyer and Seller shall enter into a Joint Venture Agreement ("JV Agreement") in the form of Exhibit "E" attached hereto. Pursuant to the JV Agreement, Buyer and Seller shall share equally in the EBITDA, as defined in the JV Agreement, with respect to all of Buyer's operations for a period of ten (10) years after the Closing. The JV Agreement shall be entered into no later than January 1, 2014, and, unless the parties mutually agree otherwise, shall terminate on January 31, 2014 if the Closing has not occurred by that date.

(d)    As provided for in the JV Agreement, the Assets shall remain on the Premises until the Note has been paid in full unless the Management Committee (as defined in the JV Agreement) determines otherwise. Pursuant to the JV Agreement Buyer shall continue to operate the Business at the Premises, and prior to January 1, 2014 Buyer shall take all required actions to register and qualify to do business in California as a foreign limited liability company.

5.    **Allocation of Price; Taxes.**

5.1    Allocation of Purchase Price. The consideration for the Assets shall be allocated to the Assets in accordance with the provisions of Section 1060 of the Internal Revenue Code and the regulations thereunder as set forth on Schedule D attached hereto.

5.2    Sales and Use Taxes. The parties believe that the transfer of Assets contemplated by this Agreement may be exempt from sales and use tax. Nevertheless, in the event that such transfer is subject to sales or use tax, Buyer shall pay the entire cost of any sales, transfer or similar taxes payable in connection with the sale, assignment, and transfer of the Assets.

5.3    Personal Property Taxes. Any personal property taxes imposed upon the Business with respect to tangible personal property included in the Assets shall be paid by Seller with respect to the period prior to the Closing Date and shall be paid by Buyer with respect to the period on and after the Closing Date.

6.    **Closing and Closing Conditions.**

6.1    The Closing. Subject to the satisfaction or waiver of the conditions provided for in Sections 6.2 and 6.3 below, the Closing of the purchase of the Assets (the "Closing") shall be held at the office of Kroloff, Belcher, Smart, Perry & Christopherson, 7540

Shoreline Drive, Stockton, California 95219 on January 31, 2014, or such other date and time as the parties shall agree (the "Closing Date").

6.2    Buyer's Condition to Closing. The obligations of Buyer under this Agreement are subject to the satisfaction of the following conditions, unless waived by Buyer:

(a)    Seller's Performance. Seller shall have performed all obligations required by this Agreement to be performed by it at or before Closing.

(b)    Seller's Representations. The representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects as of the Closing Date as though made at that time.

(c)    Bill of Sale. Seller shall deliver to Buyer a duly executed Bill of Sale in the form attached hereto as Exhibit "F".

(d)    Other Documents. Seller shall deliver to Buyer duly executed originals of the Security Agreement, Lease, Joint Venture Agreement and Lease and a Certificate of Status with respect to Seller issued by the California Secretary of State.

(e)    Good Standing Certificate; Opinion of Counsel. Seller shall deliver to Buyer a Certificate of Status for Seller issued by the California Secretary of State and opinion signed by Seller's counsel.

(f)    Form. The form and substance of all certificates, instruments, opinions and other documents delivered to Buyer under this Agreement shall be satisfactory in all reasonable respects to Buyer and its counsel.

6.3    Seller's Conditions to Closing. The obligations of Seller under this Agreement are subject to the satisfaction of the following conditions, unless waived by Seller:

(a)    Buyer's Performance. Buyer shall have performed all obligations required by this Agreement to be performed by it at or before Closing, including, without limitation, payment of the Cash Consideration.

(b)    Documents. Buyer and Jameson shall deliver to Seller duly executed originals of the Note, Security Agreement, Guaranty, Lease, and JV Agreement, a good standing certificate with respect to Buyer issued by the Pennsylvania Secretary of State, and a Certificate of Status issued by the California Secretary of State confirming that Buyer has qualified to do business in California as a foreign limited liability company.

(c)    Buyer's Representations. The representations and warranties of Buyer and Jameson set forth in this Agreement shall be true and correct in all material respects as of the Closing Date as though made at that time.

(d)    Good Standing Certificate; Opinion of Counsel. Buyer shall deliver to Seller a good standing certificate for Buyer issued by the Commonwealth of

Pennsylvania, a Certificate of Status issued by the California Secretary of State confirming that Buyer has registered in California as a foreign limited liability company, and an opinion signed by Buyer's counsel.

(e)    Form. The form and substance of all certificates, instruments, opinions and other documents delivered to Seller under this Agreement shall be satisfactory in all reasonable respects to Seller and its counsel.

7.    **Representations and Warranties of Seller**. Seller represents and warrants to Buyer as follows:

7.1    Authority. Approval and Enforceability.

(a)    California Corporation. Seller is a corporation duly organized, validly existing and in good standing under the laws of California.

(b)    Power to Execute Agreement. Seller has full power and authority to execute, deliver and perform its obligations under this Agreement. All actions of Seller necessary for such execution, delivery and performance have been, or, as of the Closing Date, will have been duly taken.

(c)    Absence of Contracts. The execution and delivery by Seller of this Agreement does not, and the completion of the transactions contemplated by this Agreement will not, result in any conflict with, breach of, or termination or forfeiture under (or upon the failure to give notice or the lapse of time, or both, result in any conflict with, breach of, or termination or forfeiture under) any terms or provisions of the charter documents, as amended, of Seller or any statute, rule, regulation, judicial or governmental decree, order, judgment, agreement, lease, loan agreement, debenture, indenture, mortgage or other instrument to which Seller is a party or to which any of its assets are subject and which individually or in the aggregate is material to Seller.

(d)    Enforceability. Upon the due execution and delivery by the parties, this Agreement will be a binding obligation of Seller enforceable against Seller in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

7.2    Litigation. There is no suit, action (equitable, legal, administrative or otherwise), proceeding or investigation of any kind pending or threatened against Seller. To Seller's best knowledge, there is no factual basis for any such suit, action, proceeding or investigation.

7.3    Assets. Seller has and will transfer to Buyer good and marketable title to the Assets. The Assets are free and clear of restrictions on or conditions to transfer or assignment. The Assets will be transferred to Buyer free and clear of mortgages, liens, encumbrances, claims and restrictions. The Assets are not held under any leases, security agreements, conditional sales contracts, or other title retention arrangements. Except as otherwise set forth herein, all Assets shall be delivered to Buyer in AS-IS condition.

7.4     Other Tangible Personal Property. Schedule B attached to this Agreement is a complete and accurate schedule describing all machinery, equipment, furniture, supplies, tools, documentation, schematics, drawings, and all other tangible personal property owned by, in the possession of, or used by Seller in connection with the Business, except Seller's inventory and the Retained Assets. The quality of the tangible personal property and equipment of Seller included in the Assets shall be on an AS-IS WHERE-IS basis as of the Closing.

7.5     Brokers. Seller has not dealt with any investment bankers, finders or brokers in connection with the transactions contemplated by this Agreement.

**8.     Representations and Warranties of Buyer.**

8.1     Representations and Warranties of Buyer. Buyer and Jameson represent and warrant to Seller as follows:

(a)     Pennsylvania LLC. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Pennsylvania.

(b)     Power to Execute Agreement. Buyer and Jameson each have the full power and authority to execute and deliver this Agreement and to perform their respective obligations hereunder. All actions of Buyer necessary for such execution, delivery and performance have been, or, as of the Closing Date, will have been duly taken.

(c)     Absence of Conflicts. The execution and delivery by Buyer and Jameson of this Agreement does not, and the performance and consummation of the transactions contemplated by this Agreement will not, result in any conflict with, breach or violation of a default, termination or forfeiture under (or upon the failure to give notice or the lapse of time, or both, result in any conflict with, breach or violation of, or default, termination or forfeiture under) any terms or provisions of the charter documents, as amended, of Buyer or any statute, rule, regulation, judicial or governmental decree, order, judgment, agreement, lease, loan agreement, debenture, indenture, mortgage or other instrument to which Buyer or Jameson is a party.

(d)     Enforceability. Upon the due execution and delivery by the parties, this Agreement will be a binding obligation of Buyer and Jameson enforceable against them in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

(e)     Litigation. There is no suit, action (equitable, legal, administrative or otherwise), proceeding or investigation of any kind pending or threatened against Buyer or Jameson and there is no factual basis for any such suit, action, proceeding or investigation of which Buyer or Jameson is aware, which could materially affect the ability of Buyer or Jameson to carry out the transactions contemplated hereunder in accordance with the terms hereof.

(f)    Brokers.  Neither Buyer nor Jameson has not dealt with any investment bankers, finders or brokers in connection with the transactions contemplated by this Agreement.

(g)    Buyer's Sole Member.  Jameson is the sole member of Buyer.

## 9.    Covenants of Seller.

9.1    Governmental Documents.  If, after the Closing, in order to properly prepare Buyer's financial statements, tax returns or other documents or reports required to be filed with governmental authorities, it is necessary that Buyer be furnished with additional information relating to the Assets and such information is in the possession of Seller and can reasonably be furnished to Buyer, then Seller shall promptly furnish such information to Buyer.

9.2    Covenant Not To Compete.  For a period of ten (10) years after the Closing Date neither Seller nor any shareholder, officer or director of Seller shall directly or indirectly compete with Buyer's business as it exists immediately after the Closing by engaging in the same or substantially similar business in the Non-Compete Area (as hereinafter defined) or by working or consulting for, investing in or otherwise participating in the ownership, management, or operation of any such business in the Non-Compete Area; provided, however, the covenant provided for in this Section 10.3 shall terminate and be of no further force or effect in the event Buyer or any successor-in-interest of Buyer with respect to the Business is no longer operating the Business in the Non-Complete Area.  The "Non-Compete Area" shall consist of all fifty (50) states comprising the United States and all of its territories.  The shareholders, officers and directors of Seller are executing this Agreement solely for the purpose of agreeing to and being bound by the provisions of this Section 9.2.

## 10.    Covenants of Buyer and Jameson.

10.1    Governmental Documents.  If, after the Closing Date, in order to properly prepare tax returns or other documents or reports required to be filed with governmental authorities or financial statements, it is necessary that Seller be furnished with additional information relating to the Assets and such information is in possession of Buyer and can reasonably be furnished to Seller, Buyer will furnish such information to Seller.

10.2    Further Restrictions.  Until the Note is paid in full, Buyer and James agree to the following restrictions:

(a)    Buyer shall not sell, transfer or encumber any of its assets, including the Assets which are the subject of this Agreement, except as required in connection with the Acquisition Financing, as provided for in the Security Agreement and JV Agreement, or in the ordinary course of Buyer's business with respect to the sale of Buyer's products.

(b)    Buyer shall not admit any member other than Jameson without the prior written consent of Seller, which consent may be granted, conditioned, or withheld in Seller's sole discretion.

(c)     Jameson shall not sell, transfer or encumber his ownership interest in Buyer.

## 11.     Indemnification and Related Matters.

11.1     Indemnification of Buyer. Seller shall indemnify and hold harmless Buyer and its members, managers and officers, if any, from and against any claims, actions, damage, expense, liability, loss or deficiency, including without limitation, reasonable attorneys' fees and other costs and expenses incident to any suit, action, claim or proceeding (collectively, the "Damages") arising out of, relating to or in connection with:

(a)     any inaccuracy in any representation or the breach of any warranty made by Seller in this Agreement;

(b)     any failure of Seller to perform or observe any term of this Agreement;

(c)     the failure to comply with the bulk sales laws set forth in Division 6 of the Uniform Commercial Code as adopted by the State of California.

(d)     Seller's accounts payable prior to and as of the Closing Date and all other obligations and liabilities of Seller arising prior to the Closing, including, without limitation, income and sales taxes owed by Seller for any period prior to the Closing.

The indemnity set forth in Section 11.1(c) above is included in an abundance of caution in the event that it is determined that the transactions contemplated by this Agreement are subject to such bulk sales laws and shall not imply or suggest in any way that such bulk sales laws apply.

11.2     Indemnification of Seller. Buyer will indemnify and hold harmless Seller and its officers, directors and shareholders, from and against any claims, actions, damage, expense, liability, loss or deficiency including without limitation, reasonable attorneys' fees and other costs and expenses incident to any suit, action, claim or proceeding (collectively, the "Damages"), arising out of or resulting from:

(a)     any inaccuracy in any representation or the breach of any warranty made by Buyer or Jameson in this Agreement;

(b)     any failure of Buyer or Jameson to perform or observe any term of this Agreement;

(c)     the operation of the Business and/or the ownership of the Assets after Closing;

11.3     Survival of Representations. The representations and warranties made by the parties in this Agreement shall survive for one (1) year after the Closing.

11.4   Notice.   Any claim by an indemnified party for Damages under Sections 11.1 or 11.2 will be made in writing and will state in detail the basis on which the claim for Damages is made.   Buyer and Seller will seek in good faith to resolve any disagreement by negotiation.   The indemnified party may not take legal action against the indemnifying party or offset Damages against payments due the indemnifying party unless such written claim has been given at least thirty (30) days in advance or, if less than thirty (30) days, immediately after the discovery of the Damages.

11.5   Third Party Actions.

(a)   All claims for indemnification under Section 11.1 or 11.2 involving third party actions or demands shall be made in accordance with the procedure set forth in this Section 11.5.

(b)   Promptly after receipt by an indemnified party of notice of any third party action or demand which gives rise to Damages, such indemnified party shall notify the indemnifying party.   Failure so to notify the indemnifying party shall relieve it of any liability that it may have to any indemnified party to the extent that the defense of such action is materially prejudiced by such failure, provided the indemnifying party did not receive or otherwise have actual notice thereof.

(c)   The indemnifying party shall be entitled to participate in the defense of the third party action or demand and, at its option, to assume the defense thereof with counsel satisfactory to the indemnified party provided (i) that the indemnifying party confirm that the action or demand is covered by its indemnification obligation, and (ii) Buyer reserves the right to retain control of the defense of any action or demand which could affect Buyer's ongoing operations.   If the indemnifying party receives notice of any action or demand, it shall promptly notify the indemnified party as to whether it intends to control the defense thereof.

(d)   If an indemnifying party defends an action, (i) no compromise or settlement thereof may be effected by the indemnifying party without the indemnified party's consent (which shall not be unreasonably withheld) unless the sole relief provided is monetary damages that are paid in full by the indemnifying party and (ii) the indemnified party shall have no liability with respect to any compromise or settlement thereof effected without its consent.

(e)   If notice is given to an indemnifying party of the commencement of any action and it does not, within twenty (20) days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense thereof, the indemnified party shall be entitled to assume the defense thereof.   In such event, the indemnifying party shall not be bound by any compromise or settlement thereof effected by the indemnified party without its consent, which shall not be unreasonably withheld.

12.   General Provisions.

12.1   Notices.   All notices and other communications hereunder shall be in writing.   Notices shall be delivered personally, by registered or certified mail, return receipt

requested, or by commercial courier. Notices shall be effective when delivered in this manner and will be deemed given on the date the notice is delivered to the following address:

> BUYER and JAMESON:    Innovative Bowling Products, LLC
> 250 North Main Street
> Jacobus, PA 17407
> Attention: John Jameson

> SELLER:    Exactacator, Inc.
> 2237 Stagecoach Road
> Stockton, CA 95215
> Attention: James G. Nesbitt

12.2    Entire Agreement; Amendment. This Agreement may be amended by the parties only by an instrument in writing signed on behalf of each of the parties. This Agreement constitutes the entire agreement and supersedes all prior and contemporaneous agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

12.3    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California as applied to agreements made and performed in California by residents of California.

12.4    Counterparts. This Agreement may be executed in counterparts, each of which shall be considered one and the same agreement.

12.5    Specific Performance. The parties acknowledge that damages would be an inadequate remedy for any breach of the provisions of this Agreement and agree that the obligations of the parties hereunder shall be specifically enforceable, including, without limitation, the provisions of Section 9.2 above.

12.6    Attorneys' Fees. In any arbitration or court action between the parties to enforce this Agreement or the rights of the parties hereunder, the prevailing party in such action (as determined by the arbitral panel or court) will be entitled to receive a reasonable sum for its attorneys' fees and all other reasonable costs and expenses incurred in such action or suit.

12.7    Severability of Provisions. If any provision of this Agreement shall be held invalid or unenforceable, the remaining provisions of this Agreement shall not be affected thereby.

12.8    Assignment, Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may not be assigned by any party whether by operation of law or otherwise without the prior written consent of the other party.

12.9    Third Parties. This Agreement is not intended, and shall not be construed, to confer upon any person other than the parties any rights or remedies. The headings contained in this Agreement are for reference only and shall not affect the meaning of any section.

12.10    Fees, Costs and Expenses. Unless specifically stated to the contrary in this Agreement, all expenses incurred in connection with the transactions contemplated by this Agreement shall be the sole responsibility of the party incurring such expenses. Such expenses shall include fees incurred for accountants, investment bankers, brokers and legal counsel.

12.11    Announcements. Except as required by law, neither party will make any public disclosure of this Agreement without the prior consent of the other party.

*(signatures on following page)*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**BUYER:**

**SELLER:**

INNOVATIVE BOWLING PRODUCTS, LLC,
a Pennsylvania limited liability company

By: _____
   John Jameson, Its Sole Member

**JAMESON:**

_____
JOHN JAMESON

EXACTACATOR, INC.,
a California corporation

By: _____
   James G. Nesbitt, Chief Executive Officer

By: _____
   Barbara Nesbitt, Secretary

The undersigned, comprising all of the shareholders, officers and directors of Seller are executing this Agreement for the purpose of agreeing to the provisions of Section 9.2 thereof and to confirm that the sale of the Assets and other transactions provided for in the Agreement have been approved by Seller's directors and shareholders.

_____
JAMES G. NESBITT, individually and as Trustee of the Nesbitt Family Trust established on June 12, 2003

_____
THOMAS K. WINKLER, individually and as Trustee of the Winkler Family 1993 Trust, dated June 15, 1993

_____
JOHN M. NAKASHIMA

_____
DENNIS J. FASELLI

_____
DONALD R. BAKER, individually and as Trustee of the Baker Family Trust

_____
CINDY WAGNER

_____
JUSTIN J. HOLCOMB

_____
BARBARA NESBITT, individually and as Trustee of the Nesbitt Family Trust established on June 12, 2003

_____
ANNA MARIE WINKLER, Trustee of the Winkler Family 1993 Trust, dated June 15, 1993

_____
KELLY M. NAKASHIMA

_____
LAURIE FASELLI

_____
MARGARET A. BAKER, Trustee of the Baker Family Trust

_____
SHELLEY L. HOLCOMB

## LIST OF SCHEDULES

A    -    Personal Property

B    -    Retained Assets

C    -    Contracts

D.         Purchase Price Allocation

## SCHEDULE A
## TO
## ASSET PURCHASE AGREEMENT

### PERSONAL PROPERTY

1.    Slug Production Equipment

2.    Slug Machining Equipment

3.    Vinyl Slug Production Molds and related items

4.    Vinyl Thump Insert Molds and related items

5.    Injection Molding Equipment

6.    Tools

7.    Sand paper Production Press and Tools

8.    Office Furniture and Equipment

9.    4 Head Melco Embroidery Machine

10.   Shipping Department Equipment

**SCHEDULE B**
**TO**
**ASSET PURCHASE AGREEMENT**

**RETAINED ASSETS**

1.    Cash, cash equivalents, and Seller's bank account balances at the Closing;

2.    Seller's accounts receivable at the Closing;

3.    Seller's automobiles;

4.    All real property owned by Seller, including the Premises and the Kapalua Golf Villa condominium;

5.    Single head Melco embroidery machine;

6.    The Intellectual Property described in the license provided for in Section 5.03 of the JV Agreement.

## SCHEDULE C
## TO
## ASSET PURCHASE AGREEMENT

### CONTRACTS

1.    Exclusive Purchase Agreement with T. A. Davies

**SCHEDULE D**
**TO**
**ASSET PURCHASE AGREEMENT**

## PURCHASE PRICE ALLOCATION

| Item | Amount |
|---|---|
| Goodwill | $4,450,000 |
| Inventory | $800,000 |
| Equipment | $750,000 |