1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                          EASTERN DISTRICT OF CALIFORNIA

9

10    INNOVATIVE BOWLING PRODUCTS,          No.  2:19-cv-00177-MCE-AC
      LLC, a Pennsylvania limited liability
11    company; JOHN JAMESON, an
      individual; and DAVID LYNCH, an
12    individual,                            **MEMORANDUM AND ORDER**

13                   Plaintiffs,

14           v.

15    EXACTACATOR, INC., a California
      corporation; JAMES NESBITT, an
16    individual; BARBARA NESBITT, an
      individual; STEPHEN GROOM, an
17    individual; SHELLEY ROGERS, an
      individual, NAKASHIMA GOLF, INC., a
18    California corporation,

19                   Defendants.

20    _____

21    EXACTACATOR, INC., a California
      corporation,
22
                     Counterclaimant,
23
             v.
24
      INNOVATIVE BOWLING PRODUCTS,
25    LLC, a Pennsylvania limited liability
      company, JOHN JAMESON, an
26    individual, and DAVID LYNCH, an
      individual,
27
                     Counter-Defendants.
28

                                        1

1    Through the present lawsuit, Plaintiff Innovative Bowling Products, Inc. ("IBP")

2    and its Chief Executive Officer, Plaintiff John Jameson (collectively "Plaintiffs" unless

3    otherwise specified) seek redress for business disputes surrounding Plaintiffs' purchase,

4    management and control of another company, Defendant Exactacator, Inc.

5    ("Exactacator").  During the pendency of the purchase, Exactacator's former majority

6    owners, James and Barbara Nesbitt, continued to be involved in joint operations

7    pertaining to IBP and Exactacator.  Both Nesbitts are named as Defendants in Plaintiffs'

8    operative First Amended Complaint ("FAC"), as are the Nesbitts' daughter, Shelley

9    Rogers, Exactacator's accountant, Stephen Groom, the Nesbitts' business partner, John

10   Nakashima, and Nakashima's business, Nakashima Golf, Inc.  The jurisdiction of this

11   court is predicated upon diversity of citizenship under 28 U.S.C. § 1332(a)(1).  IBP is a

12   Pennsylvania limited liability company and Jameson is a Pennsylvania resident.

13   Exactacator and Nakashima Golf, on the other hand, are California corporations and the

14   individually-named Defendants are all California residents.

15   In response to the FAC's fourteen claims for relief pled against the various

16   defendants, two motions to dismiss made pursuant to Federal Rule of Civil Procedure

17   12(b)(6)[1] are now before this Court for adjudication. The first Motion (ECF No. 30),

18   brought by Defendant Exactacator, challenges the first four causes of action pled in the

19   FAC on grounds they fail to state any viable claim.  Exactactor's Motion also seeks to

20   strike paragraphs 105-111 of the FAC on grounds that the allegations are immaterial and

21   impertinent and are consequently subject to removal under Rule 12(f).  The second

22   Motion (ECF No. 40), brought on behalf of all named Defendants, takes issue with the

23   ///

24   ///

25   ///

26   ///

27

28   _____

[1] All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

2

1   eleventh and thirteenth causes of action,[2] also on grounds that they fail to state any

2   viable claim under Rule 12(b)(6).  As set forth below, Defendants' Motions are

3   GRANTED in part and DENIED in part.[3]

4

5                                    **BACKGROUND**[4]

6

7          Prior to January 2014, when it purchased Exactacator's assets, IBP engaged in

8   the manufacture and sale of commercial bowling equipment (ball mills/drills and

9   engravers) from its facility in York, Pennsylvania.  Exactacator, on the other hand,

10  fabricated and sold consumer bowling products such as bags, gloves, shirts and ball

11  finger inserts under the "VISE" brand from a location in Stockton, California.

12         To effectuate the sale of Exactacator's business to IBP, IBP and Exactacator

13  entered into a series of agreements beginning in December of 2013.  Through the so-

14  called Asset Purchase Agreement ("APA", attached as Ex. A to Def. IBP's Mot., ECF

15  No. 30-1),[5] IBP acquired most of Exactacator's assets, including its inventory, personal

16  property, goodwill, and contracts rights, in exchange for $6 million to be paid, pursuant to

17  _____

18         [2] Plaintiffs' Thirteenth Claim for Relief was the only claim in this lawsuit being asserted by Plaintiff
    David Lynch, who according to the FAC provided financial services to IBP through his company, Lynch
    Financial, LLC.  By Stipulation and Order approved by the Court on February 14, 2020, it was agreed that

19  Lynch would file a Request for Dismissal, without prejudice, as to that claim, which alleges defamation per
    se against the Nesbitt Defendants. See ECF No. 54.  Although the Court's review of the docket in this

20  matter does not indicate that the Thirteenth Claim has formally been dismissed, since no opposition to the
    Motion to Dismiss as to that claim has been made, the Court will treat the claim as not being pursued at

21  this juncture and will not address it further in this Memorandum and Order.  Consequently, Defendants'
    Motion to Dismiss filed on January 9, 2020 (ECF No. 40), will be considered only insofar as it challenges

22  the Eleventh Claim for Relief, which seeks an accounting.

23         [3] Having concluded that oral argument would not be of material assistance, both Motions were
    submitted on the briefs in accordance with E.D. Local Rule 230(g).

24
           [4] This section is drawn, sometimes verbatim, from the allegations contained in Plaintiffs' FAC
25  (ECF No. 27), unless otherwise specified.

26         [5] Because the APA and the other agreements were extensively discussed within the FAC,
    Defendant IBP properly attached the documents to its Motion for the Court's review and consideration in

27  accordance with the incorporation-by-reference doctrine, under which a defendant may seek to
    incorporate a document into the complaint "if the plaintiff refers extensively to the document or the

28  document forms the basis of the plaintiff's claim."  Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988,
    1002 (9th Cir. 2018).

a leveraged buyout, in three $2 million payments over ten years (referred to as the "Purchase Consideration" in the APA).  The first $2 million payment, denominated as the "Cash Consideration," was to be made at closing; the remaining two payments, payable on January 1, 2019 and January 1, 2024 at $2 million each, respectively, were evidenced by a Promissory Note (id. at Ex. C) guaranteed by Plaintiff Jameson personally.  IBP also entered into a written Security Agreement with Exactacator (id. at Ex. D) under which it gave Exactacator a security interest in the VISE assets.

According to the FAC, during negotiation of the APA and related documents, the parties recognized that IBP would likely need to borrow funds from a bank to make each of the three Purchase Consideration payments.  The FAC states: "Because everyone knew that a third-party lender would likely require a security interest in the same VISE Assets covered by Exactacator's Security Agreement, Exactacator agreed to subordinate its security interest to the third-party lender for the total amount of the Note." FAC, ¶ 51.  In order to do that, according to Plaintiffs, the APA contains the following language under the heading "Purchase Consideration", which addresses both the initial $2 million "Cash Consideration" to be paid at closing and the additional $4 million obligation secured by the Promissory Note:

> Pursuant to the Security Agreement, [Exactacator] shall have a second priority security interest in all assets of [IBP], including, without limitation, the Assets which are the subject of this Agreement, and a first priority interest in [IBP's] rights under the [Joint Venture] Agreement.

APA, ¶ 2.

The APA goes on to confirm that the lender providing the Acquisition Financing (which is defined as the initial Cash Consideration plus an additional $500,000 line of credit) "will have a first prior interest in Buyer's assets, including the Assets that are the subject of this Agreement."  Id. at ¶ 4(b).  While that language addresses only the consideration to be paid at closing, the paragraph goes on to contemplate the potential for additional borrowing, stating as follows:

///

4

> The Parties agree that until the Note is paid in full any indebtedness of Buyer which is secured by Buyer's assets, including, without limitation, the Acquisition Financing, shall not have an outstanding balance in excess of $4,500,000, which amount may include sums borrowed by [IBP] to fund the principal payments due under the Note.

Id. at ¶ 4(b).

IBP maintains that the above-enumerated provisions, considered together, reflect the parties' intent that Exactacator would subordinate its security interest to the funding necessary to make the additional payments, up to a maximum of $4,500,000.  With respect to the initial Acquisition Financing provided by Metro Bank, the Nesbitts did execute, on behalf of Exactacator, an Intercreditor and Subordination Agreement  (Ex. E. to Def.'s Mot., ECF No. 30-5) confirming that Metro Bank's interest in the assets pledged as collateral was superior to that of Metro Bank.

Post-acquisition, IBP operated as two divisions, the so called "York" division in Pennsylvania, and the VISE division in Stockton (which comprised the former Exactacator operations).  The York division continued to manufacture and sell bowling industry equipment; the VISE division, as previously stated, made and sold consumer products under the VISE brand.  IBP continued to pay the salary and benefits of several former Exactacator employees, including Defendant Barbara Nesbitt and her daughter, Defendant Shelley Rogers, who together managed and controlled the VISE division's financial books and records along with payroll and accounts receivable and payable.

Along with the APA, the Promissory Note and Security Agreement made in connection therewith, as part of the Exactacator sale, the parties also entered into a Joint Venture Agreement ("JVA", id. at Ex. B) which provided that Exactacator would receive the greater of either half of IBP's annual profits annually over the same ten-year period, or $750,000.  Given Exactacator's continued interest in IBP's business operation following the sale, the JVA contained a statement of purpose as follows:

///

///

1
2
3
4

> **1.01    Purpose** . . . This Agreement is being entered into
> pursuant to the [APA] in order to facilitate, promote and
> further the development and expansion of [IBP's] business
> involving the manufacture and sale of bowling ball
> interchangeable parts and devices, including, without
> limitation, the "VISE" product line purchased by [IBP] from
> Exactacator.

5    Id. at ¶ 1.01.

6    Given the JVA's stated objective to facilitate the expansion of IBP's business, the

7    JVA further contains a cooperation clause obligating Exactacator to "execute such other

8    and further instruments and documents as are or may become reasonably necessary to

9    effectuate and carry out the purposes of this Agreement."  Id. at ¶ 10.07.

10    IBP maintained separate accounts to monitor each division's income and

11    expenses, and calculated a consolidated income figure at least once a year in order to

12    calculate the profit share due Exactacator pursuant to the JVA.  In order to determine the

13    yearly profit-sharing amount and to further the purpose of the joint venture, the JVA also

14    established a Joint Venture Management Committee ("JVMC").  The JVMC initially

15    consisted of three members:  Plaintiff Jameson, Defendant Jim Nesbitt and

16    Exactacator's accountant, Defendant Groom.  Later, in September of 2016, the JVA was

17    amended to add two additional members, Defendant John Nakashima and Plaintiff

18    David Lynch, IBP's outside financial consultant and Chief Financial Officer.  Under the

19    JVA, decisions made by the JVMC were to be made by majority vote.

20    Between January 2014 and January 2018, IBP alleges that it made each annual

21    payment required under the JVA in amounts that totaled more than $3.2 million.  IBP

22    further had managed to repay the initial $2 million Metro Bank loan, which Plaintiff

23    Jameson claims increased his member equity in IBP from a negative number to more

24    than $2 million.  Jameson claimed the business was thriving, with net income increasing

25    by some 60 percent.

26    Plaintiffs maintain that it was IBP's very success, in an unbridled case of "sellers'

27    remorse," that bred this lawsuit.  Indeed, not long after the sales transaction closed, the

28    FAC alleges that Barbara Nesbitt made it known to her husband that she wanted

1    Exactacator back and was angry at her husband for having sold it.  When Jameson

2    refused to undo the sale, Jameson alleges that Jim Nesbitt told him that "you will feel the

3    wrath of Jim Nesbitt. . . I will make you my indentured servant and destroy you."  FAC,

4    ¶ 5.

5           Plaintiffs claim that over the course of the following five years, the Nesbitts did

6    everything they could to follow through with this threat, expressing numerous

7    disagreements as to Jameson's decisions regarding the day-to-day business operations

8    of IBP.  According to the FAC, matters came to a head before the second $2 million

9    installment in the $6 million purchase price was due on January 1, 2019.  In November

10   2018, Plaintiffs obtained a loan commitment from People's Bank[6] for $1.8 million and an

11   additional $1.2 million line of credit that would have enabled it to not only make the

12   second $2 million payment but also provide more operating capital to obtain the

13   additional inventory needed to satisfy increased sales.  The People's Bank commitment

14   included the expected requirement that Exactacator sign a new subordination agreement

15   that would maintain its junior security position as to the acquired VISE assets.  Although

16   IBP claims the total amount of the People's Bank loan would have entailed only a

17   $250,000 increase from the initial arrangements made in 2014, the Nesbitts objected to

18   the proposal, initially only with respect to the increase in the line of credit and did so only

19   two weeks before the loan was scheduled to close even though notice of the increased

20   line of credit had been given to the JVMC some six months previously.

21          IBP responded by securing a new loan commitment that it claims would simply

22   have maintained the status quo, given that the Metro Bank loan had been paid off.  The

23   Nesbitts nonetheless continued to refuse to sign the subordination agreement, acting on

24   what Plaintiffs describe as a "long sought-after chance to take back the VISE assets they

25          [6] The original lender, Metro Bank, had been acquired by First National Bank ("FNB"), and according to Plaintiffs, FNB was not interested in extending the previous acquisition loan because FNB
26   was in Pennsylvania and Much of the IBP collateral was in California.  See FAC, ¶¶ 63, 158.  IBP, however, was able to go to the same loan officers who underwrote the original Metro Bank loan, who had
27   since relocated to People's Bank.  Plaintiffs aver that the loan commitment obtained from People's Bank for the second $2 million payment had terms nearly identical to those on the original loan to which the
28   Nesbitts had subordinated in 2014.

1   sold in 2014." FAC, ¶ 25. Plaintiffs claim that the Nesbitts gave no further explanation

2   for their refusal to subordinate on the new loan other than that they were not required to

3   do so.

4         Faced with a default on the second $2 million loan installment which had been

5   due on January 1, 2019, Plaintiffs filed the present lawsuit on January 25, 2019.

6   Subsequently, the Nesbitts not only declared IBP's loan in default but also, according to

7   Plaintiffs, diverted up to $5 million in IBP accounts receivable to a new Bank of Stockton

8   checking account to which neither IBP nor Jameson had access. In doing so, Plaintiffs

9   claim that Defendants Jim Nesbitt, Nakashima and Groom (with the aid and assistance

10   of Defendants Barbara Nesbitt and Rogers) violated the fiduciary duties they owed to

11   IBP as members of the JVMC to promote the development and expansion of IBP's

12   business. By "starving" IBP of cash through the above-described diversion of

13   receivables, Plaintiffs allege that Defendants caused IBP to be unable to meet its payroll

14   obligations and in so doing to irretrievably alienate many of IBP's employees.

15         The Nesbitts only effort to resolve the crisis occasioned by their failure to

16   subordinate was a demand that Defendant Jameson agree to an additional amendment

17   of the JVA that Plaintiffs claim would have significantly changed the terms of the 2014

18   sale by Exactacator. First, the Nesbitts required that any loan for the second $2 million

19   installment be made from them personally on terms that were apparently substantially

20   less beneficial than those offered by People's Bank. Second, the Nesbitts demanded

21   increased profit-sharing amounts, and the recoupment of expenses totaling some

22   $339,500. Finally, they demanded that certain royalty payments to their daughter,

23   Defendant Rogers, be extended by five additional years. Plaintiffs allege that these

24   terms, if accepted, would have required IBP to pay more than $1 million more than that

25   already agreed to in the 2014 transaction, not to mention the fact that Jameson would

26   have been required to cede significant control of IBP to the Nesbitts and Nakashima.

27   According to Jameson, the Nesbitts claimed that these changes were not negotiable and

28   that he had no choice other than to accept them. Claiming that the Nesbitts' efforts

1  amounted to "extortion," Jameson rejected their proposals.

2        Once Plaintiffs instituted the present lawsuit on January 25, 2019, Exactacator

3  filed a counterclaim asserting Plaintiff's default on the scheduled 2019 payment, which

4  Plaintiffs claim was "self-manufactured" by the Nesbitts for the reasons enumerated

5  above.  The counterclaim did not stop with that alleged breach of contract, however.  It

6  went on to accuse Plaintiffs of what they allege are utterly unfounded claims of fraud,

7  RICO racketeering, wire and mail fraud, and other rots of financial wrongdoing

8  concerning IBP and the Joint Venture.  Plaintiffs allege that there was no basis

9  whatsoever for the counterclaim, and indicate that even Jim Nesbitt, who was

10  designated by Exactacator as its Rule 30(b)(6) witness for the facts underlying the

11  counterclaim, could point to no evidentiary support justifying it.

13  **STANDARD**

15      **A.**    **Motion to Dismiss under Rule 12(b)(6)**

16        On a motion to dismiss for failure to state a claim under Federal Rule of Civil

17  Procedure 12(b)(6), all allegations of material fact must be accepted as true and

18  construed in the light most favorable to the nonmoving party.  Cahill v. Liberty Mut. Ins.

19  Co., 80 F.3d 336, 337-38 (9th Cir. 1996).  Rule 8(a)(2) "requires only 'a short and plain

20  statement of the claim showing that the pleader is entitled to relief' in order to 'give the

21  defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell

22  Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41,

23  47 (1957)).  A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require

24  detailed factual allegations.  However, "a plaintiff's obligation to provide the grounds of

25  his entitlement to relief requires more than labels and conclusions, and a formulaic

26  recitation of the elements of a cause of action will not do."  Id. (internal citations and

27  quotations omitted).  A court is not required to accept as true a "legal conclusion

28  couched as a factual allegation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting

1   Twombly, 550 U.S. at 555).  "Factual allegations must be enough to raise a right to relief

2   above the speculative level."  Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright &

3   Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) (stating that the

4   pleading must contain something more than "a statement of facts that merely creates a

5   suspicion [of] a legally cognizable right of action")).

6       Furthermore, "Rule 8(a)(2) . . . requires a showing, rather than a blanket

7   assertion, of entitlement to relief."  Twombly, 550 U.S. at 555 n.3 (internal citations and

8   quotations omitted).  Thus, "[w]ithout some factual allegation in the complaint, it is hard

9   to see how a claimant could satisfy the requirements of providing not only 'fair notice' of

10  the nature of the claim, but also 'grounds' on which the claim rests."  Id. (citing Wright &

11  Miller, supra, at 94, 95).  A pleading must contain "only enough facts to state a claim to

12  relief that is plausible on its face."  Id. at 570.  If the "plaintiffs . . . have not nudged their

13  claims across the line from conceivable to plausible, their complaint must be dismissed."

14  Id.  However, "[a] well-pleaded complaint may proceed even if it strikes a savvy judge

15  that actual proof of those facts is improbable, and 'that a recovery is very remote and

16  unlikely.'"  Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

17      A court granting a motion to dismiss a complaint must then decide whether to

18  grant leave to amend.  Leave to amend should be "freely given" where there is no

19  "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice

20  to the opposing party by virtue of allowance of the amendment, [or] futility of the

21  amendment . . . ."  Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v.

22  Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to

23  be considered when deciding whether to grant leave to amend).  Not all of these factors

24  merit equal weight.  Rather, "the consideration of prejudice to the opposing party . . .

25  carries the greatest weight."  Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183,

26  185 (9th Cir. 1987)).  Dismissal without leave to amend is proper only if it is clear that

27  "the complaint could not be saved by any amendment."  Intri-Plex Techs. v. Crest Group,

28  Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d 1006,

1    1013 (9th Cir. 2005); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir.

2    1989) ("Leave need not be granted where the amendment of the complaint . . .

3    constitutes an exercise in futility . . . .")).

4    **B.    Motion to Strike**

5         The Court may strike "from any pleading any insufficient defense or any

6    redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "[T]he

7    function of a 12(f) motion to strike is to avoid the expenditure of time and money that

8    must arise from litigating spurious issues by dispensing with those issues prior to trial...."

9    Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983).  Immaterial

10   matter is that which has no essential or important relationship to the claim for relief or the

11   defenses being pleaded.  Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993),

12   rev'd on other grounds 510 U.S. 517 (1994) (internal citations and quotations omitted).

13   Impertinent matter consists of statements that do not pertain, and are not necessary, to

14   the issues in question.  Id.

15

16                                   **ANALYSIS**

17

18   **A.    Subordination**

19        Defendant Exactacator moves to dismiss the first four causes of action of

20   Plaintiffs' FAC, which it describes as IBP's "contract-related claims."  Those claims seek

21   specific performance (Claim One), allege breach of contract as to the APA and JVA

22   (Claim Two). as well as breaches of the covenant of good faith and fair dealing attendant

23   to those contracts (Claim Three), and further seek declaratory judgment and injunctive

24   relief as to Exactacator's failure to perform in a manner consistent with its agreements

25   (Claim Four).[7]  According to Exactacator, all these claims are predicated on the legally

26   incorrect premise that Exactacator was obliged to sign an agreement subordinating its

27   _____

         [7] Plaintiffs have not opposed Exactacator's Motion to Dismiss the Fourth Claim as duplicative of
28   Plaintiffs' previous three causes of action.  In the absence of any opposition, the Motion is GRANTED as
     to said Fourth Claim.

1    security position behind that of the lender providing financing for IBP's payment of the

2    second purchase installment due Exactacator in 2019.  Exactacator maintains that the

3    agreements effectuating the IBP sale are susceptible of no meaning beyond the

4    inescapable conclusion that it was required to subordinate its security position only to

5    the extent IBP borrowed monies to pay the initial $2 million to purchase the company.

6    Exactacator's Motion to Dismiss IBP's first four causes of action all rest upon that

7    contention.

8         The Court is unpersuaded by Exactacator's arguments.  As indicated above, the

9    APA broadly provides that Exactacator "shall have a **second priority security interest**

10   **in all assets** of [IBP], including, **without limitation**, the Assets which are the subject of

11   [the APA", and a first priority interest in "[BP's] rights under the (JVA]."  APA, ¶ 2.  While

12   the term "Assets," as used in the APA, is specifically defined to include the various

13   property rights sold to IBP under the APA (id. at ¶ 1), the language employed by the APA

14   sweeps more broadly in extending Exactacator's second priority interest to any other

15   undefined "asset" whatsoever, without limitation.  Given that all-encompassing language,

16   the Court cannot rule out that second-priority status would apply to all loan

17   arrangements, particularly since the only item reserved for first-priority treatment was

18   IBP's rights under the JVA.

19        Significantly, too, the APA goes on to specifically permit IBP to acquire additional

20   indebtedness up to a maximum of $4.5 million, which the agreement specifically

21   acknowledges "may include further sums borrowed by [IBP] to fund the principal

22   payments due under the Note."  Id. at ¶ 4(b).  The Court agrees that Paragraphs 2 and

23   4(b), considered together, are consistent with Plaintiffs' argument that Exactacator was

24   obligated to accept a second priority interest in financing obtained by IBP to fund the

25   second $2 million payment.  Because the initial $2 million loan obtained for the first

26   purchase installment had already been paid off, IBP's indebtedness as of the time it

27   secured was well below the $4.5 million threshold.  Therefore, under Plaintiffs'

28   construction, Exactacator was obligated to subordinate to an additional loan for the

1  second installment but wrongfully refused to do so.

2        Although the Court cannot consider parol evidence in the context of a motion to

3  dismiss, it also bears noting that, at least according to the FAC, the parties specifically

4  contemplated the need for additional financing, with Exactacator continuing to assume a

5  second priority interest as to such financing, and the APA being revised to anticipate that

6  eventuality.  According to Plaintiffs, Jameson told Jim Nesbitt and Stephen Groom

7  several times during the course of the parties' purchase negotiations that he would need

8  to be able to borrow additional funds to finance future installment payments.  <u>See</u> FAC,

9  ¶ 51.  Plaintiffs not only cite those conversations, but claim that the Nesbitts' lawyer, Kim

10  Smith, revised Paragraphs 2 and 4(b) of the APA to permit that eventuality.  Moreover,

11  Plaintiffs claim that contemporaneous notes taken by Stephen Groom during the

12  negotiations reflect that even Barbara Nesbitt believed that bank renewal should be

13  permitted.  <u>See</u> Pls.' Opp., ECF No. 43, pp. 4-6.

14        As Plaintiffs point out, California has a liberal parol evidence rule under which

15  such evidence is admissible to clarify the parties' intent, so long as it is consistent with

16  reasonably interpreting the contract.  <u>Pacific Gas & Elec. Co. v. G.W. Thomas</u>

17  <u>Drayage & Rigging Co</u>., 69 Cal. 2d 33, 37 (1968).  This Court has previously observed

18  that "[p]arol evidence is admissible to show all circumstances surrounding a transaction

19  in order to determine the meaning intended and understood by the parties."  <u>United</u>

20  <u>States v. Sterling Centrecorp Inc</u>., 2011 WL 6749801 at *6 (E.D. Cal. 2011).  Parol

21  evidence is precluded only if it contradicts the agreement itself, and as set forth above it

22  appears to the Court that the parties' agreement here is susceptible to Plaintiffs'

23  interpretation and, by extension, the parol evidence Plaintiffs could offer in support

24  thereof.  <u>See</u> <u>Rader v. Bruister</u>, 2010 WL 2179799 at *4 (E.D. Cal. 2010); citing <u>U.S. v.</u>

25  <u>Triple A Mach. Shop, Inc</u>., 857 F.2d 579, 585 (9th Cir. 1988).

26        The Court is further unpersuaded by Exactacator's argument that because the

27  Security Agreement and Promissory Note executed by the parties did not refer to a

28  second priority interest, no such interest was contemplated.  As Plaintiffs point out, both

1   those documents necessarily focus on Plaintiffs' obligations to Exactacator (in giving it a

2   security interest in the purchased assets and in promising to pay the remaining purchase

3   price), and would not be expected to reflect duties owed by Exactacator as opposed to

4   those falling to Plaintiffs.

5       Plaintiffs' reliance on the APA's so-called "Integration Clause," as contained in

6   Paragraphs 12.2 of the APA,[8] fares no better for two reasons.  First, as indicated above,

7   the Court finds the language of the APA to be at least potentially consistent with

8   Plaintiffs' argument, and as such the Integration Clause does not bar Plaintiffs' position

9   herein.  Second, as Plaintiffs point out, because the APA refers to numerous other

10  associated documents (like the JVA and Security Agreement) that were not executed

11  until as much as six weeks later, the Integration Clause has no force and effect since the

12  APA was not integrated anyway in the absence of specifically referenced agreements

13  (including the JVA, the Promissory Note, the Security Agreement and an Intercreditor

14  Agreement) that had not yet been prepared.  A written agreement is deemed "integrated

15  only if it is "a complete and final embodiment of the terms of the agreement" (see

16  Masterson v. Sine, 68 Cal. 2d 222, 225 (1968), and the fact that the referenced

17  documents had not yet been prepared makes any integration of the APA at the time it

18  was signed impossible.

19      Moreover, to the extent that Exactacator was obligated under the APA to assume

20  a second priority position with respect to Plaintiffs' additional 2018 financing, that failure

21  evidences a breach not only of the APA but also the JVA.  As enumerated above, the

22  stated purpose of the JVA is to "facilitate, promote and further the development and

23  expansion" of IBP, and to that effect it required Exactacator to "execute each such other

24  and further instruments and documents as are or may become reasonably necessary or

25  convenient to effectuate" that purpose.  JVA, ¶¶ 1.01, 10.07.  Exactacator's position with

26  respect to subordination; namely, that it did not agree to a second security position with

27          [8] The Integration Clause states: "This Agreement constitutes the entire agreement and
    supersedes all prior and contemporaneous agreements and understandings, both written and oral,
28  between the parties with respect to the subject matter hereof."  Id. at ¶ 12.2

14

1    respect to additional financing because it was not required to do so, may well be

2    incorrect.  Therefore, particularly given Plaintiffs' allegations that Exactacator's

3    agreement as to subordination was not only required but also necessary in order to

4    further IBP's business (IBP claims it needed additional financing in order to acquire

5    additional inventory in the face of rapidly burgeoning sales), Exactacator's refusal to

6    subordinate (which Plaintiffs claim any bank would have insisted upon as a prerequisite

7    to extending a further commercial loan to IBP) would appear to be a breach of both the

8    APA and the JVA.  Consequently, Exactacator's Motion to Dismiss Plaintiffs' Claim Two,

9    which alleges such breaches, must be DENIED.

10         With respect to Plaintiffs' First and Third Claims, which seek specific performance

11   and damages for breach of the implied covenant of good faith and fair dealing,

12   respectively, Exactacator's arguments for dismissal depend upon there being no

13   possibility of a breach in the first place (see Mot., ECF No. 30, 8:20-25).  Because the

14   Court disagrees with that fundamental premise, Exactacator's challenge to those claims

15   also fails.

16         **B.    Claim for Accounting**

17         For an eleventh cause of action, Plaintiffs seek an accounting from all

18   Defendants.  The so-called Exactacator-affiliated Defendants (Defendants James and

19   Barbara Nesbitt, Shelley Rogers, John Nakashima, and Nakashima Golf, Inc.), but not

20   Defendant Exactacator itself, move to dismiss the accounting claim against them,

21   alleging that "the FAC does not allege any complex accounts that would require an

22   accounting" and further contains no allegations that they "owe IBP any sum, let alone a

23   sum that cannot be ascertained without an accounting."  Mot., ECF No. 40, 2:18-20.

24         An action for accounting, which is equitable in nature, may be brought to compel a

25   defendant to account for money or property 1) where a special relationship exists

26   between the parties, or 2) where, even though no fiduciary relationship exists, the

27   accounts are so complicated that an ordinary legal action demanding a fixed sum is

28   impracticable.  See Herrejon v. Ocwen Loan Servicing, LLC, 980 F. Supp. 2d 1186,

15

1   1207 (E.D. Cal. 2013); <u>Civic Western Corp. v. Zila Industries, Inc</u>., 66 Cal. App. 3d 1, 14

2   (1977).  "A cause of action for an accounting requires a showing that a relationship

3   exists between the plaintiff and defendant that requires an accounting, and that some

4   balance is due the plaintiff that can only be ascertained by an accounting."  <u>Teselle v.</u>

5   <u>McLaughlin</u>, 173 Cal. App. 4th 156, 179 (2006).  A fiduciary relationship between the

6   parties suffices but is not mandatory; all that is required is that some relationship exists

7   that requires an accounting.  <u>See</u> <u>Kritzer v. Lancaster</u>, 96 Cal. App. 2d 1, 6-7 (1950).

8   Typically, to require an accounting, there must be a complexity of the accounts that

9   makes demanding a fixed sum impracticable.  <u>Herrejon v. Ocwen Loan Servicing, LLC</u>,

10  980 F. Supp. 2d at 1207.

11          While defense counsel does not dispute the availability or relief in the form of an

12  accounting from Exactacator, it argues that there has been no showing that any of the

13  Exactacator-affiliated Defendants took any funds from IBP or owe any money to the

14  company that would require an accounting.  Counsel contends that IBP has not

15  explained why an accounting from Exactacator alone would be insufficient.  Moreover,

16  according to counsel, IBP has not shown any special relationship between it and either

17  Defendant Nakashima Golf, Defendant Barbara Nesbitt, or Nesbitt's daughter,

18  Defendant Shelley Rogers, that would justify an accounting.  Additionally, while counsel

19  concedes that Defendants Jim Nesbitt and John Nakashima were members of the Joint

20  Venture Management Committee tasked with running the Joint Venture between IBP

21  and Exactacator, and despite the fact, as indicated above, that the JVA's stated purpose

22  was to promote IBP in the interest of all concerned, counsel still argues that neither Mr.

23  Nesbitt or Mr. Nakashima should be accountable in a fiduciary fashion to IBP, allegedly

24  since they were Exactacator-appointed, as opposed to IBP, representatives on the

25  Committee.

26          Plaintiffs, in opposition, put matters into a starkly different perspective.  As the

27  FAC alleges, the Exactacator-affiliated Defendants, as the officers, directors and/or sole

28  (or) majority shareholders of both Exactacator and Nakashima Golf, are alleged to have

1    masterminded the diversion of nearly $5 million dollars in accounts receivable payments

2    allegedly belonging to IBP into a Bank of Stockton account where only they were

3    signatories.  Defendants did this at the same time they were employees of IBP (Jim and

4    Barbara Nesbitt and Shelley Rogers), officers of IBP (John Nakashima), and members of

5    the JVMC tasked with facilitating IBP's success under the JVA (Defendants Jim Nesbitt

6    and John Nakashima).  Plaintiffs allege that these relationships carry various fiduciary

7    duties owed to IBP.  Notwithstanding those duties, according to Plaintiffs, Defendants

8    have never accounted for those diverted funds, explained an inexplicable increase in

9    gross profits from the VISE division of IBP that would inure to their benefit, or allowed

10   Plaintiff Jameson, as the sole member of IBP, to gain access to IBP's own computers to

11   enable a forensic accounting.  Moreover, Plaintiffs maintain that the Defendants have

12   rejected numerous requests for a joint forensic accounting that could unravel the

13   financial conundrum allegedly created by their actions.

14           Plaintiffs' FAC points out the many interrelationships both between the

15   Exactacator-affiliated Defendants themselves and with IBP.  John Nakashima, together

16   with the Nesbitts, is one of the controlling shareholders of Exactacator and Nakashima is

17   both Vice-President of Exactacator and the President of IBP's VISE division.

18   Nakashima Golf is a California corporation operating at the same location as both

19   Exactacator and IBP's VISE division.  The Nesbitts and Nakashima are also the officers,

20   directors and controlling shareholders of Nakahima Golf.  At the same time, as indicated

21   above, both Jim and Barbara Nesbitt, together with their daughter, Shelley Rogers, are

22   employees of IBP.  Plaintiffs allege that Exactacator paid Nakashima Golf some $63,000

23   from the funds Defendants diverted to the Bank of Stockton account to engage in sham

24   transaction designed to usurp IBP's business opportunities.  Both Barbara Nesbitt and

25   Shelley Rogers, while allegedly responsible for performing accounting and financial

26   functions for the VISE division, are claimed to have participated in the diverting funds

27   ///

28

1  away from IBP even though both were ostensibly employees of IBP.[9]  Defendant Rogers

2  is also alleged to have received certain royalty payments, despite the fact that under the

3  terms of the JVA no such payments were due until 2024.

4           Accepting the FAC's factual allegations as true, which the Court must do on a

5  motion to dismiss under Rule 12(b)(6) (see Cahill v. Liberty Mut. Ins. Co., supra, 80 F.3d

6  at 337-38), Plaintiffs have amply demonstrated their entitlement to an accounting to

7  untangle the web of malfeasance that their allegations purport to document, and in the

8  process to establish what if any funds were improperly diverted.  Defendants' Motion to

9  Dismiss the accounting claim is accordingly DENIED.

10          **C.      Striking Allegations Pertaining to Exactacator's Counterclaim**

11          In addition to moving to dismiss Claims One through Four of Plaintiffs' FAC as

12  discussed above, Exactacator also moves to strike Paragraphs 105 to 111, which allege

13  that a counterclaim filed on March 25, 2019 along with Exactacator's answer to Plaintiffs'

14  original Complaint (ECF No. 7) was malicious and devoid of any evidentiary support.

15  Exactacator first argues that the Counterclaim is moot because the Complaint to which it

16  related was superseded by the filing of the FAC on November 22, 2019, with no

17  renewed counterclaim being asserted as to that amended pleading.  In addition, and

18  more fundamentally, Exactacator claims that because the counterclaim was prepared in

19  the course of these proceedings any allegations as to its impropriety are barred by

20  California's litigation privilege, as codified by California Civil Code § 47(b).  That privilege

21  protects communications that 1) are made in the course of legal proceedings; 2) by

22  litigants or other participants authorized by law; 3) to achieve the objects of the litigation;

23  and 4) have some connection or logical relation to the action.  See Silberg v. Anderson,

24  50 Cal. 3d 205, 212 (1990).  As Silberg points out, the litigation privilege is intended to

25  promote zealous advocacy by removing the threat of liability, and has been applied to

26 _____

27          [9] While an accounting is not usually necessary between an employer and employee, the IBP
employees here (Defendants Jim and Barbara Nesbitt and their daughter, Shelly Rogers) are alleged to
have been in control of IBP's records, and received monies intended for IBP such that IBP itself does not

28  know the amounts involved.  Under those circumstances, an accounting is proper.  See Arbuckle v.
Clifford F. Reid, Inc., 118 Cal. App. 272, 275-76 (1931).

1    numerous instances of alleged abuse of process, as Plaintiffs appear to argue here.  Id.

2    at 212-214.

3          Aside from arguing that the their allegations concerning the counterclaim should

4    not be read in isolation, but instead should be considered in conjunction with the entire

5    course of conduct towards Plaintiffs by Exactacator and by the Nesbitts, Plaintiffs

6    primarily rely upon the paragraphs at issue with respect to the Thirteenth Claim for

7    Relief, which alleged defamation by the Nesbitts against David Lynch.  Plaintiffs argue

8    that the allegations made in the counterclaim evince the malice needed to support a

9    defamation claim.  As indicated above, however, Plaintiffs' counsel indicates he is no

10   longer pursuing a defamation claim and consequently has not opposed the dismissal

11   request as to that cause of action.

12         In the Court's view, allegations pertaining to a counterclaim filed by Exactacator in

13   the course of this litigation fall squarely within the litigation privilege and are accordingly

14   improper, even aside from the fact that Exactacator's counterclaim, by its own

15   admission, is no longer being pursued in any event.  Exactacator's Motion to Strike

16   Paragraphs 105 to 111 of the FAC is accordingly GRANTED.

17

18                                    **CONCLUSION**

19

20         Based on the foregoing, Defendant Exactacator's Motion to Dismiss and to Strike

21   (ECF No. 30) are GRANTED, in part.[10]  To the extent the Motion requests that

22   Paragraphs 105 to 111 of the First Amended Complaint be stricken, it is GRANTED.

23   Insofar as the Motion seeks dismissal of individual claims, it is GRANTED as to the

24   Fourth Claim for Relief, which has not been opposed, but is otherwise DENIED.

25   ///

26   ///

27
_____
28         [10] The Court declines Plaintiffs' suggestion that the Motion be converted into a summary judgment
motion pursuant to Rule 12(d).

1      The Motion to Dismiss brought on behalf of Defendants Jim and Barbara Nesbitt,

2   Shelley Rogers, John Nakashima and Nakashima Golf, Inc. (ECF No. 40), which

3   challenges the Eleventh Claim for Relief, for an accounting, is DENIED.

4      IT IS SO ORDERED.

5   Dated:  July 30, 2020

6

7                                            _____
                                             MORRISON C. ENGLAND, JR.
8                                            SENIOR UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28